## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT McFARLANE,         :
       Petitioner,      :
                            :       **CIVIL ACTION**
      v.                   :       **NO. 01-1657**
                            :
FRANK D. GILLIS et al.,     :
       Respondents.    :
                            :

Diamond J.                                        **January 14, 2011**

---

### <u>MEMORANDUM</u>

The Third Circuit has remanded this matter for a ruling on the timeliness of the Habeas

Petition filed by state prisoner Robert McFarlane.   28 U.S.C. § 2254.   I will deny McFarlane's

Petition because I conclude that it is time-barred.

I.    <u>PROCEDURAL HISTORY</u>

A.  <u>Trial</u>

On February 17, 1993, Philadelphia Police discovered the body of Sharon Halterman in a

crawlspace at 1815 East Lippincott Street, an abandoned house occupied by Petitioner and Edward

Sparango.   On April 23, 1993, Sparango pled guilty to the third degree murder of Ms. Halterman,

to conspiracy, and to abuse of a corpse.   18 PA. CONS. STAT. ANN. §§ 2502, 903, and 5510.

Sparango agreed to testify for the Commonwealth at Petitioner's June 1994 trial in the

Philadelphia Common Pleas Court.   By the time of trial, however, Sparango, who was dying of

AIDS, was too weak to testify in court, and so appeared via videotape.

According to Sparango, on the evening of February 16, 1993, he and Petitioner were

together at a bar near 1815 Lippincott.   *(Trial Tr. June 10, 1994 at 45.)*   McFarlane said—as he

had repeatedly said in previous weeks—that he wanted to kill his wife. At about midnight, McFarlane announced that he would instead murder Eileen Parris, who resembled his wife. Ms. Parris refused to accompany McFarlane and Sparango to their house. Minutes later, Petitioner ordered Sparango to lure Sharon Halterman to the abandoned house by offering her phony vials of crack cocaine that were actually talcum powder. *(Trial Tr. June 10, 1994 at 50-52.)*

Once inside 1815 Lippincott, Ms. Halterman proceeded to the second-floor middle bedroom Petitioner occupied. *(Trial Tr. June 14, 1994 at 30.)* She refused Sparango's demand for sex. According to Sparango, this angered McFarlane, who instructed her to disrobe, sit on the floor, and watch television. Petitioner approached Ms. Halterman from behind and wrapped a clothesline around her neck, causing her face to turn purple and strangling her. *(Id. at 55-56, 58, 65-66.)* Sparango left to use the bathroom. *(Id. at 56.)* When Sparango returned, Ms. Halterman was dead. *(Id. at 55, 57.)* Petitioner ordered Sparango to place Ms. Halterman's pants back on her and help him cram the body into a crawlspace. *(Id. at 72.)* The two then watched television and fell asleep.

Sparango, a homeless drug addict, was described as sickly, diminutive, and of limited intelligence. *(Trial Tr. June 8, 1994 at 30, 47; June 14, 1994 at 68.)* According to Sparango and Richard Lewis (a former occupant of 1815 Lippincott), Petitioner—who was 6'2" and weighed 240 pounds—kept Sparango in a state of subservience through continual torture. McFarlane set Sparango on fire while he slept, beat him, burned his genitals with an electric hot plate, and cut his thumbs and hung him upside down as he bled. *(Trial Tr. June 8, 1993 at 14, 47; June 10, 1994 at 56-57, 69-70, 81-83; June 14, 1994 at 77.)* In his post-arrest statements to the police, during his guilty plea colloquy, and in his trial testimony, Sparango acknowledged that he helped McFarlane

kill Ms. Halterman for fear of his own life. *("I was scared that if I didn't [help McFarlane kill Ms. Halterman] he would kill me." Statement March 28, 1993; Guilty Plea Colloquy April 23, 1993 at 46; "I was scared because I thought he was going to kill me." Trial Tr. June 10, 1994 at 56.)*

Included in the Commonwealth's evidence was Ms. Parris's testimony that on the night of February 16, 1993, Petitioner and Sparango tried to lure her to their house with the lie that her friend George Wolf was waiting for her. Ms. Parris refused because Petitioner frightened her. *("Bobby McFarlane was very intimidating, asking me why I had not come the night before, and he was very upset, and he scared me." Trial Tr. June 9, 1994 at 27.)* McFarlane admitted that when he heard police arrive at 1815 Lippincott on February 17, 1993, he immediately fled, wearing only shorts and socks. *(Trial Tr. June 14, 1994 at 71.)* McFarlane also acknowledged that he had been friends with Sparango for twelve years, and that in 1990, the two had committed a burglary together. *(Trial Tr. June 14, 1994 at 30-31, 97.)*

Police testified that in Petitioner's bedroom—where Ms. Halterman was strangled—they found McFarlane's wallet, the clothesline used to strangle her, vials of talcum powder made to look like crack cocaine, and a disability application that McFarlane admitted he had filled out. *("I was trying to get money for nothing." Trial Tr. June 14, 1994 at 38.)* That application was dated February 17, 1993 (the day of the Halterman murder). *(Trial Tr. June 8, 1994 at 108.)* It included the following "question and answer" written in Petitioner's hand:

> What is your disabling condition?
> Answer: Violent outbursts when talked to loud or yelled at, and tried to hurt or kill you.
> ****
> Depending on what happened to make me angry, I would take it out on anyone, anywhere including working.
> ****

I can no longer concentrate on work. My mind starts wandering and I think about what happened to me in the past and if anyone tried to do anything against me, I would think of ways of hurting them and involve other people.

*(Trial Tr. June 13, 1994 at 119.)*

Blood evidence—which has become the focus of post-trial litigation—did not figure prominently at trial. As the trial judge observed: "There is no evidence that there was any blood at all [shed during the murder] in this case." *(Trial Tr. June 13, 1994 at 132.)* Police testified to collecting blood samples from 1815 Lippincott, primarily from the first-floor walls and floors. *(Trial Tr. June 10, 1994, 53-56; June 7, 1994 at 76-77, 109-10.)* None of the samples was taken from Petitioner's second-story middle bedroom, where the murder occurred. *(Doc. No. 4 at 9-10 "Physical Evidence.")* Petitioner testified at suppression that the bloodstains were on the first floor when he moved into 1815 Lippincott weeks before the Halterman murder. *(Suppression Hr'g April 20, 1994 at 37-38.)* Sparango and Mr. Lewis testified at trial, however, that after McFarlane had cut Sparango's thumbs and hung him upside down on the first floor, McFarlane smeared Sparango's pooling blood on the first-floor walls. *(Trial Tr. June 10, 1994 at 69-70, 81-83; June 8, 1993 at 47.)* Although police had sought to conduct DNA tests on the blood found under the victim's fingernails, the sample proved insufficient for then-existing technology.

At trial, McFarlane sought to convince the jury that Sparango alone had committed the murder. Petitioner testified that he and Sparango had parted soon after leaving the bar, so that McFarlane was not in the house when Ms. Halterman was killed. *(Trial Tr. June 14, 1994 at 47-48.)* McFarlane denied that he had tortured Sparango, testifying that George Wolf had cut Sparango's thumbs and hung him upside down. *(Trial Tr. June 14, 1994 at 59, 95.)*

Defense counsel Jack Myers—an extremely experienced lawyer—attacked Sparango's credibility as a "polluted source" and vigorously challenged the credibility of the Commonwealth's witnesses. *(Trial Tr. Closing Arguments June 14, 1994 at 4-13, 19.)*

The two-week trial concluded on June 15, 1994, when the jury convicted Petitioner of first degree murder, conspiracy, and abuse of a corpse. The court sentenced Petitioner to life imprisonment for the murder and a consecutive sentence of five to ten years on the conspiracy charge. In December of 1994, Sparango died of AIDS. *(Doc. No. 87 at 3 n.3.)*

B. Post-Trial

After Petitioner's conviction, the court appointed new counsel, Brian McMonagle—also an extremely experienced lawyer—who contended in Petitioner's post-verdict motions, *inter alia*, that Mr. Myers was ineffective for failing to investigate and test the blood evidence recovered from 1815 Lippincott. Mr. Myers testified at post-trial that although he had sought to test blood found on the victim's nail clippings, he saw no reason to DNA test any other blood evidence:

> [MR. MYERS:] Where am I going? For what reason? The person was strangled. There was no blood, no nothing on the person to compare. The only area that I went, I'm trying to tell you, was the [attempted] DNA testing [of blood from the victim's fingernail clippings].

*(Evidentiary Hr'g June 28, 1995 at 80.)*

Although the trial court stated that "Defense counsel should have had the blood at the scene tested," *(Post-Sentence Motions August 22, 1995 at 6)* it denied ineffectiveness relief:

> Defendant has failed to meet his burden of proving that the claim possesses arguable merit because he has failed to show that if such tests had been conducted, it would have resulted in the discovery of exculpatory evidence or evidence useful for impeachment purposes. Moreover, because defendant has failed to provide this Court with his own analysis of the blood demonstrating that a test would have yielded evidence beneficial to the defense he has failed to establish that counsel's inaction prejudiced him. This claim for these reasons is meritless and should be denied.

*(Doc. No. 22, Ex. 7 at 14.)*   The Pennsylvania Superior Court affirmed Petitioner's judgment of sentence, basing its decision entirely on the trial court's opinion, thus rejecting, *inter alia*, Petitioner's ineffectiveness claim.   *(Doc. No. 22, Ex. 8.)*   On March 4, 1998, the Pennsylvania Supreme Court denied *allocatur*.   Commonwealth v. McFarland [sic], 723 A.2d 670 (Pa. 1998) (per curiam).    Petitioner's conviction became final 90 days later, on June 2, 1998.   See Whitney v. Horn, 280 F.3d 240, 252 n.13 (3d Cir. 2002).

C.   Habeas Proceeding

On April 4, 2001 McFarlane, now represented by Christina Rainville, filed a § 2254 Petition and supporting papers in this Court.   *(Doc. Nos. 1-4.)*   McFarlane also filed and supplemented a Discovery Motion, through which he sought an astonishingly wide array of evidence, including:

- blood or DNA evidence from Mr. Sparango (who had died almost seven years before)

- blood and DNA evidence from bloodstains found at the crime scene, on the victim's pants, and under her fingernails

- blood samples or other DNA evidence from six other men

- "all records relating to the autopsies" of several Philadelphia murder victims killed in 1995 or 1996

- all autopsy, blood, or DNA evidence in every murder after the death of Sharon Halterman "where the victim was female, found naked or naked from the waist down and strangled," and

- DNA from every rape or murder case in Philadelphia since 1993.

*(Doc. No. 13, Ex. B at 1-2.)*

As I have described, Petitioner testified at suppression and Sparango testified at trial that the crime scene blood had nothing to do with the Halterman murder. *(Suppression Hr'g April 20, 1994 at 37-38; Trial Tr. June 10, 1994 at 69-70, 81-83.)* That testimony notwithstanding, McFarlane asserted his "actual innocence" based on recently conducted tests revealing that the crime scene blood was type B and matched neither Ms. Halterman's type A blood, nor McFarlane's type O blood. Petitioner again alleged Mr. Myers's ineffectiveness for failure to test blood evidence from Ms. Halterman's fingernails and pants. Petitioner also argued evidentiary insufficiency based on Sparango's unreliability as a witness. Finally, Petitioner argued that no reasonable jury would have convicted him in light of a pattern of purportedly similar murders that occurred years after the Halterman murder. *(Doc. No. 1.)*

The matter was referred to a Magistrate Judge, who heard oral argument on McFarlane's discovery demands. *(Doc. Nos. 14, 15.)* The Commonwealth argued, *inter alia*, that: 1) because his Petition—filed almost three years after his conviction became final—was time-barred, McFarlane was not entitled to take discovery in support of that Petition; and 2) the discovery McFarlane sought could not establish his innocence. *(Doc. No. 12 at 4-7.)* Petitioner responded, *inter alia*, that the limitation clock had been equitably tolled. *(Doc. No. 13.)* The Magistrate Judge did not conduct an evidentiary hearing on the tolling issue, and failed to rule on the Commonwealth's timeliness contention. *(Doc. No. 18 at 10-11.)* Rather, on February 19, 2002, she partially granted the Discovery Motion, ordering the Commonwealth to provide Petitioner with the following:

> (1)     All records relating to Edward Sparango's blood type and DNA typing. If the Commonwealth possesses blood samples from Sparango but does not have blood type or

DNA records for that blood, the Commonwealth shall produce Mr. Sparango's blood samples.

(2)     All records relating to DNA test results and blood type test results of the blood found on the pants of Sharon Halterman.   If the Commonwealth has not performed blood or DNA typing on the blood found on the pants of Sharon Halterman's pants [sic], the Commonwealth shall produce the victim's pants.

(3)     All records relating to DNA test results and blood type test results of the blood found underneath the fingernails of Sharon Halterman.   If the Commonwealth has not performed blood or DNA typing on the blood found underneath the victim's fingernails, the Commonwealth shall produce the victim's fingernail scrapings.

*(Doc. No. 18 at 18.)*

Appealing the Discovery Order to this Court, the Commonwealth submitted objections on March 6, 2002 and moved to stay discovery on March 7, 2002.   *(Doc. Nos. 19, 20.)*   After granting the Stay on April 15, 2002, this Court on April 23, 2003 nonetheless ordered Episcopal Hospital (where Sparango had been repeatedly treated) to provide Petitioner with Sparango's medical records.   *(Doc. Nos. 24, 34.)*   In retrieving those records (which disclosed that Sparango's blood type was B, matching the blood found at 1815 Lippincott), Petitioner's counsel spoke on May 21, 2003 with Carolyn Nicolardi, the Hospital's Director of Quality and Risk Management.   In 1993-94, Ms. Nicolardi was working as a nurse and treated Sparango when he was a patient in the Hospital's Prison Unit.   *(Doc. No. 82, Ex. A at 2.)*   Ms. Nicolardi provided Petitioner with an affidavit in which she averred:

While I was changing the dressing [on his wound], Sparango said, without any prompting from me, words to the effect that he wanted to explain to me why he was not such a bad guy.

Sparango then proceeded to state, in words that I recall vividly: "You know, I had to kill her because my buddy said, if you don't kill her, I'll kill you."

Sparango did not identify his "buddy," and to this day, I do not know the identity of the person to whom he was referring.

8

(*Id.* at 2-3.)

Arguing that Ms. Nicolardi's affidavit constituted newly discovered evidence of innocence, on July 14, 2003, McFarlane amended the Habeas Petition pending in this Court, adding the Nicolardi claim and withdrawing the contention respecting "pattern" or similar murders. *(Doc. No. 37.)* Proceeding under the Post Conviction Relief Act, McFarlane also sought relief in state court with respect to the Nicolardi evidence. *(Id.);* 42 PA. CONS. STAT. ANN. § 9541 et seq. Because the Amended Habeas Petition was now "mixed," on August 29, 2003, this Court stayed its proceedings pending McFarlane's exhaustion of the Nicolardi contention in state court. *(Doc. No. 41.)*

D. PCRA

McFarlane filed his first and only PCRA petition on July 14, 2003, alleging, *inter alia,* that Ms. Nicolardi's affidavit was newly discovered evidence of innocence. *(Doc. No. 70, Ex. at 4.)* The trial court denied Petitioner's request for an evidentiary hearing and rejected his claims without explanation on July 26, 2005. *Commonwealth v. McFarlane, No. 0984 Philadelphia 1993 (filed July 27, 2005); Notice of Intent to Dismiss Pursuant to Pennsylvania Rule of Criminal Procedure 907 (June 17, 2004).* In affirming, the Superior Court stated that it would "not reach the merits" of McFarlane's claims, concluding that his 2003 "petition is time-barred." *(Doc. No. 70, Ex. at 4);* 42 PA. CONS. STAT. ANN. § 9545(b) (obligating McFarlane to seek PCRA relief by June 2, 1999—one year after his conviction became final). The Post Conviction Relief Act provides a narrow exception to its one-year limitation clock for certain after-discovered evidence claims. 42 PA. CONS. STAT. ANN. § 9545(b)(1)(iii). The Superior Court ruled that McFarlane had not shown that this exception applied, finding that Ms. Nicolardi's affidavit was not

"after-discovered" because it could have been "discovered" through trial counsel's exercise of due diligence.  *(Doc. No. 70, Ex. at 7.)*   The Superior Court also found that had Sparango's statement to Ms. Nicolardi—"I had to kill her because my buddy said, if you don't kill her, I'll kill you"—been presented at trial, it would not have changed the verdict:

> At no time did Sparango mention who the "her" he killed was, nor did he ever clarify who "his buddy" was.   McFarlane has not proven that this statement even applies to his case. Such a vague statement that does not implicate McFarlane's case, cannot reasonably be believed to result in a different verdict, especially when the verdict was supported by additional evidence.

*(Id. at 8.)*

Finally, the Superior Court observed that even if Sparango had referred to McFarlane and Ms. Halterman, Petitioner would remain liable for the murder regardless of whether he had actually strangled Ms. Halterman or ordered his "buddy" Sparango to do so.   *(Id. at 8-9)* (citing Commonwealth v. Smith, 861 A.2d 892, 895 (Pa. 2004)).   The Superior Court thus reiterated the explanation of conspirator liability that Sparango admitted during his guilty plea colloquy:

> COURT: So, you realize that you are just as criminally responsible for the [Halterman] homicide as if you had perpetrated it with your own hands.   Even though you were not the person that caused the death by strangulation.
> ****
> SPARANGO: Yes.

*(Guilty Plea Colloquy April 22, 1993 at 49-50.)*

Petitioner did not further appeal the Superior Court's denial of PCRA relief.

E.   Amended/Renewed § 2254 Petition – Mandamus Request

On September 25, 2006, having exhausted the Nicolardi claim, Petitioner asked this Court to resume litigation in the instant matter.   *(Doc. No. 42.)*   On September 18, 2007, this Court vacated its Stay, thus obligating the Commonwealth to comply with the Magistrate Judge's

February 19, 2002 Discovery Order. *(Doc. No. 50.)* On October 18, 2007, the Commonwealth filed an interlocutory appeal and sought a Writ of Mandamus, arguing to the Third Circuit that the Discovery Order was illegal because it was based on a time-barred Habeas Petition. *(Doc. Nos. 51, 52.)* A day later, the Commonwealth asked this Court to stay DNA testing pending appeal. *(Doc. No. 53.)* This Court, on December 13, 2007, granted the Commonwealth's stay request. *(Doc. No. 63.)*

On November 28, 2007, the Third Circuit dismissed the Commonwealth's interlocutory appeal for lack of jurisdiction. *(Doc. No. 61.)* On May 20, 2008, holding in abeyance the Commonwealth's Mandamus request, the Third Circuit ordered this Court to determine whether McFarlane's Habeas Petition was timely *("The petition for writ of mandamus is held c.a.v. pending decision by the District Court as to the timeliness of the underlying habeas petition." Doc. No. 65.)* Over the next two months, the Parties briefed in this Court the timeliness question. Petitioner submitted, *inter alia*, supporting affidavits whose credibility the Commonwealth challenged. *(Doc. Nos. 66, 70.)*

F. <u>Reassignment</u>

On September 17, 2010, McFarlane asked the Third Circuit for a "Determination on the Merits of the Commonwealth's Petition for a Writ of Mandamus." *(<u>In re: Frank D. Gillis et al,</u> Case No. 07-4080.)* On October 4, 2010, the Third Circuit granted Petitioner's request, remanded this matter, requested its reassignment, instructed this Court to address the timeliness issue, and directed the Parties "to file status reports with this Court on the first business day of each month, beginning November 1, 2010, regarding the District Court proceedings and, specifically, any findings regarding the timeliness of the habeas petition." *(<u>Id.</u>)*

11

On October 5, 2010, this matter was reassigned to me. *(Doc. No. 76.)* It was apparent that I could not determine timeliness without first holding an evidentiary hearing so that I could resolve the factual disputes respecting Petitioner's tolling arguments. At a status conference on October 8, 2010, Petitioner requested at least three weeks to prepare for the hearing. *(Doc. No. 78.)* On October 29, 2010, I conducted the hearing at which Petitioner presented five witnesses and documentary evidence. *(Doc. Nos. 80, 82.)* On November 22, 2010, the Parties submitted Proposed Findings and Conclusions, and on November 30, 2010, they submitted Reply Memoranda. *(Doc. Nos. 87-90.)*

II. <u>FINDINGS OF FACT</u>

At the October 29th hearing, Petitioner testified and called: his mother Rosemary McFarlane, Mr. McMonagle's secretary Joanne Rizzo, Ms. Rainville, and Ms. Nicolardi. *(Doc. No. 82.)* I credit the testimony of Ms. Rizzo and Ms. Nicolardi, and partially discredit the testimony of McFarlane, his mother, and Ms. Rainville.

Pursuant to Fed. R. Civ. P. 52, I make the following findings of fact.

A. <u>McFarlane's *Allocatur* Petition</u>

After the Superior Court affirmed McFarlane's judgment of sentence on April 4, 1997, Mr. McMonagle timely sought review in the Pennsylvania Supreme Court, mailing a copy of the *allocatur* petition to McFarlane on May 19, 1997. The Supreme Court denied *allocatur* on March 4, 1998. <u>Commonwealth v. McFarland</u>, [sic] 723 A.2d 670 (Pa. 1998) (per curiam). Although Petitioner and his mother testified credibly that they were unaware of the *allocatur* denial, the remainder of their testimony on this subject is not credible.

McFarlane testified that he wrote several letters to Mr. McMonagle inquiring about his appeal. He could not produce copies of those letters, however, nor did he call Mr. McMonagle at the October 29th hearing to confirm that he received them. McFarlane acknowledged at the hearing that he never attempted to telephone Mr. McMonagle. *(Oct. 29, 2010 Hr'g Tr. at 25:6-7.)* Further, although he purportedly made repeated visits to the prison law library to discuss his case, McFarlane admitted that he never asked to see the decisions of the Pennsylvania Supreme Court, where the denial of his *allocatur* petition was reported. *(Id. at 16:19-24, 17:6-9, 20:11-13, 22:15-18);* McFarland, 723 A.2d 670. Rather, once he sought *allocatur*, Petitioner relied exclusively on his mother to determine the status of his appeal.

Ms. McFarlane never actually contacted the Supreme Court. Rather, she testified that at Petitioner's direction, she repeatedly phoned the Philadelphia City Hall general switchboard (215-686-1776)—sometimes as often as two or three times a week—and asked about her son's appeal. According to Ms. McFarlane, the City Hall operator would usually tell her to call her son's lawyer. Ms. McFarlane testified that on occasion, however, the operator reviewed the Supreme Court docket and told Ms. McFarlane that there had been no decision in her son's case. Ms. McFarlane also testified that for some three months she stopped phoning City Hall and instead wrote letters of complaint to the Philadelphia District Attorney, the President of the United States, and a local state court judge. She produced copies of none of these letters.

I find incredible the testimony of Petitioner and his mother about their efforts to determine the status of the *allocatur* application. Petitioner made no such efforts. Ms. McFarlane's only efforts were her infrequent phone calls to Mr. McMonagle's office. When she made these calls—perhaps once a month—she spoke only with Mr. McMonagle's long-standing secretary,

Joanna Rizzo.   I discredit Ms. McFarlane's testimony that Ms. Rizzo repeatedly told her that the Supreme Court had not yet ruled on the *allocatur* petition.

Ms. Rizzo testified credibly that she continually heard from the relatives of incarcerated clients with a multitude of questions about pending cases.   She was not permitted to answer their questions.   Instead, she told them to "have faith" and referred their inquiries to an attorney.   *(Oct. 29, 2010 Hr'g Tr. at 39:24-25.)*   Ms. Rizzo remembered that Ms. McFarlane had called Mr. McMonagle's office.   Although she did not recall specific conversations with Ms. McFarlane, Ms. Rizzo would not have told her the status of Petitioner's appeal, but would have referred her question to an attorney for response.   *(Id. at 39:9-10.)*   Ms. McFarlane was not contacted by anyone in Mr. McMonagle's office advising her of the status of the *allocatur* petition.   *(Id. at 72:11-15.)*

The credible evidence thus shows that neither Mr. Monagle nor anyone from his office misrepresented to Petitioner or his mother the status of his appeal.    It is equally apparent that McFarlane and his mother took few steps to determine that status.

B.   The Nicolardi Evidence

At the October 29th hearing, Petitioner also called Carolyn Nicolardi, who confirmed her 2003 affidavit regarding Sparango's statement to her.   She credibly testified that had she been asked by Petitioner's counsel earlier—for instance, in 1994—she would have then told counsel of Sparango's statement.

C.   Ms. Rainville's Efforts

Finally, Petitioner called Christina Rainville.   Reluctantly, I find that significant portions of Ms. Rainville's testimony at the October 29th hearing were not credible.   Now practicing in

Vermont, in 1997 Ms. Rainville was a partner in the law firm that continues to represent Petitioner. It was apparent from Ms. Rainville's testimony, her often embarrassed, defensive demeanor, and related evidence that because she understood neither the record in this case nor the requirement that Petitioner act promptly, she did not promptly seek habeas relief for McFarlane. To avoid these unfortunate facts, Ms. Rainville offered testimony that was often contradictory, incorrect, or demonstrably false.

Ms. Rainville testified that although she initially refused to represent Petitioner, she agreed to do so by June or July of 2000, after Ms. McFarlane "camped out" in the law firm's lobby from 9 to 5 o'clock for at least four or five days, seeking the opportunity to speak with Ms. Rainville. *(Oct. 20, 2010 Tr. at 87:13-14, 113:25-114:4.)* This version of events was contradicted by documentary evidence.

In 1997, Petitioner asked his mother to seek Ms. Rainville's help after seeing a television report of her efforts on behalf of another habeas petitioner. See Lambert v. Blackwell, 962 F. Supp 2d 1521 (E.D. Pa. 1997). Because at that time Ms. Rainville was inundated with such requests, she explained in an August 18, 1997 letter that she could not help Petitioner. *(Oct. 29, 2010 Hr'g Tr. at 86:21-25, 101:1-102:6.)* On February 24, 2000, however, Ms. Rainville sent a letter to Ms. McFarlane stating:

> Two years ago, you asked me to help with your son's criminal case. As I recall, your son had been convicted and you believed that he was innocent. This case has weighed on my mind over the last two years. Could you please give me a call so that we might discuss some ideas that I have? I cannot represent your son, but I might be able to get him some help.

*(Doc. No. 87, Ex. B.)* Contrary to Ms. Rainville's testimony, this letter—which was introduced by the Commonwealth—shows that Ms. Rainville and not Ms. McFarlane resumed communication in early 2000.

Critical to Ms. Rainville's decision respecting whether she would represent Petitioner was her belief that a blood test showing that the type B blood found "downstairs" at the crime scene did not match Petitioner's type O blood would establish Petitioner's innocence. *(Oct. 29, 2010 Hr'g Tr. at 93:3-25, 125:3-20.)* Ms. Rainville urged Ms. McFarlane to arrange for such a blood test. Ms. McFarlane responded that the prison had already denied a request to test Petitioner's blood. Ms. Rainville urged Petitioner to mail from the prison a napkin stained with his blood so that it could be tested. Ms. McFarlane feared that this might result in disciplinary action against her son. Ms. Rainville advised Petitioner's parents further:

> [MS. RAINVILLE:] [I] actually then went and tried to t[r]ack down the Department of Corrections procedures and the law on is it against the law to take a piece of garbage out of prison. And I felt comfortable with that and told them go ahead, and if anybody gives you a hard time, you can just tell them that a lawyer told you that it was okay.

*(Oct. 29, 2010 Hr'g Tr. at 90:23-91:3.)* Ms. Rainville reluctantly admitted that she was thus providing legal advice to the McFarlanes before she formally agreed to represent Petitioner. *(Oct. 29, 2010 Hr'g Tr. at 91:4-20.)*

A laboratory confirmed to Ms. Rainville on August 11, 2000 that McFarlane's blood was type O and did not match the type B blood found "downstairs" at 1815 Lippincott. Ms. Rainville testified that those test results convinced her to represent Petitioner because it was a "slam dunk" that proved his "actual innocence" and "wouldn't require much time." *(Oct. 29, 2010 Tr. at 93:24-25.)*

Thus, when she prepared McFarlane's original habeas petition in 2000—and, indeed, when she testified before me—Ms. Rainville was unaware that in 1994 the trial jury knew that the blood recovered from the crime scene was Sparango's, not that of the victim or McFarlane. *(Oct. 29, 2010 Hr'g Tr. at 124:12-126:6.)* Nor was Ms. Rainville aware that McFarlane himself had testified at suppression that those bloodstains had nothing to do with the Halterman murder. *(Suppression Hr'g April 20, 1994 at 37-38.)*

After persuading her law firm to allow her to represent Petitioner, Ms. Rainville contacted the Pennsylvania Supreme Court Prothonotary, who advised her that the Court had denied *allocatur* on March 4, 1998. Ms. Rainville immediately informed Ms. McFarlane and Petitioner of that denial.

Ms. Rainville initially testified that it took six weeks to obtain Petitioner's file from Mr. McMonagle's office. *(Oct. 29, 2010 Hr'g Tr. at 94:15-16.)* She then testified that the delay was actually four months. *(Oct. 29, 2010 Hr'g Tr. at 105:7.)* Yet, when I asked Petitioner's lawyer, now a partner in Ms. Rainville's former firm, when the firm received Petitioner's file, he responded as follows:

> [COUNSEL]: I don't know exactly, Your Honor. But I'm fairly confident it was not long after the [August 2000] blood testing so sometime in the summer of 2000.

*(Oct. 29, 2010 Hr'g Tr. at 46:15-17.)* I discredit Ms. Rainville's testimony that there was material delay in obtaining Petitioner's file or that the file transfer impeded her efforts on Petitioner's behalf.

In seeking § 2254 relief, Ms. Rainville understood that timeliness could be an issue. *(Oct. 29, 2010 Hr'g Tr. at 103:10-11.)* Unfortunately, her testimony confirmed that she did not then

(and, apparently, does not now) understand the governing law. She did not think she was obliged to seek relief promptly because she believed equitable tolling principles were inapplicable:

> [MS. RAINVILLE:] There was no equitable tolling law out there that I could base an equitable tolling claim on as far as I could tell at the time. That part of AEDPA had not been expanded to where it is today.

*(Oct. 29, 2010 Hr'g Tr. at 103:12-15.)* This is incorrect. By 1998, the Third Circuit and other courts had applied equitable tolling to the running of the applicable one-year limitation period included in the Antiterrorism and Effective Death Penalty Act. Miller v. N.J. Dep't of Corrections, 145 F.3d 616, 617 (3d Cir. 1998) ("Congress intended the one year period of limitation to function as a statute of limitation, and thus be subject to equitable tolling."); Blasi v. Attorney General of Pennsylvania, 30 F. Supp. 2d 481, 485 (M.D. Pa.1998) ("The one-year period of limitations is subject to equitable tolling."); see also Calderon v. U.S. Dist. Court for the Cent. Dist. of Cal., 128 F.3d 1283, 1289 (9th Cir. 1997) ("Every relevant signal—from the Act's plain language, to its legislative history, to its structure—points in the same direction: [AEDPA]'s one-year timing provision is a statute of limitations subject to equitable tolling, not a jurisdictional bar.").

Although Ms. Rainville thus mistakenly believed that time was not of the essence, she offered confusing and contradictory testimony, at once suggesting that she sought § 2254 relief as quickly as possible even though she believed that she had a year from the August 11, 2000 blood test in which to seek relief:

> [MS. RAINVILLE:] So my next thought was well, we have two claims then that are left. One is a year from discovery of the evidence, which would be a year from August 11th, 2000, which was the best argument I thought I could make, even though the Supreme [sic] Court thought that his blood could have been tested, I didn't think it could have been. Or an actual innocence claim. And then if we're going to do an actual innocence claim on his one and only petition in a case that's clearly time barred by the plain language of the statute, it

has to be perfect. It has to be thoroughly researched. We have to try to investigate, we have to talk to witnesses, we have to see if there's anything out there that we could find to make this as strong as it can be, that we haven't missed anything.

And that took some time. . . .

****

Q: You felt it would not help to file as quickly as possible?
[MS. RAINVILLE:] Frankly, it never occurred to me because it seemed clear that we had a year from August 11th. It seemed clear that this was a case of compelling evidence of actual innocence…. I thought our deadline was a year from August 11th, and we filed it four months in advance of that deadline.

*(Oct. 29, 2010 Hr'g Tr. at 103:16-104:4, 117:15-118:2.)*   In seeking to file a "perfect" § 2254

petition, Ms. Rainville testified that she spent 100 to 150 hours in "intense" investigative, research,

and interview work through the April 4, 2001 filing in this Court.   *(Id. at 110:20-21.)*   She could

not actually describe what she did, however:

[Q]: [W]hy was there extensive investigation needed?
 (Pause)
[MS. RAINVILLE]: I just wanted to make sure it was right....
[Q]: Who[m] did you talk to? Who — what witnesses did you have to interview? Who[m] did you have do the interviewing?
[MS. RAINVILLE]: I did the interviewing myself. And [the associate] spoke to some witnesses.
[Q]: And what witnesses were they, that you spoke to?....
[MS. RAINVILLE]: I spoke to — I don't remember.

*(Id. at 122:18-123:25.)*

In other circumstances, I would be prepared to accept that after ten years, a lawyer might

not fully recall the details of the work she performed on behalf of clients, even clients as important

as the McFarlanes evidently were to Ms. Rainville. *("[I]t's kind of embarrassing, it got to me." Id.*

*at 87:16; "I'm now feeling. . . emotionally involved in this case with this family." Id. at 93:18-20.)*

Ms. Rainville could remember virtually no details of her "intense" efforts, however.

On April 4, 2001, Ms. Rainville filed the following documents on McFarlane's behalf:

- a form Petition and thirteen-page Supporting Memorandum (with Exhibits) *(Doc. Nos. 1, 2.)*

- a single-sentence Motion to Supplement with a four-paragraph Supporting Memorandum *(Doc. No. 2.)*

- a three-page Motion for Appointment of Counsel (with an *in forma pauperis* affidavit) *(Doc. No. 3.)*

- a two-sentence Motion for Discovery and a four-page Supporting Memorandum (with Exhibits) *(Doc. No. 4.)*

These documents reflect little or no new factual or legal investigation. With the exception of the August 2000 blood test report, the Exhibits apparently were provided by the Commonwealth during pre-trial discovery. Other than innumerable references to the August 2000 blood test, the documents include descriptions of purportedly similar or pattern murders—a contention McFarlane abandoned in his Amended Petition. Finally, the documents include only two case citations: a single cite in the Discovery Memorandum, and another in the Motion to Appoint Counsel. *(Doc. Nos. 4 at 2, 3 at 2.)*

Ms. Rainville's belief that the documents had "to be perfect" notwithstanding, they, in fact, reflected Ms. Rainville's ignorance of the record she purportedly reviewed "multiple times." *(Oct. 29, 2010 Hr'g Tr. at 111:1-2.)* For instance, she began her § 2254 Memorandum as follows:

> Inevitably, there are cases where our criminal justice system fails and an utterly innocent person is wrongly convicted. This is the case of Robert McFarlane, who is serving a life sentence for a murder with which he had absolutely no involvement. Mr. McFarlane's innocence is established by clear and compelling forensic evidence found at the scene of the crime.

*(Doc. No. 2, Ex. A.)*

With this heated prose, Ms. Rainville referred to the revelatory 2000 blood test that she repeatedly invoked in the papers filed on April 4, 2001. *(See, e.g., "The blood test indicates that Mr. McFarlane is actually innocent of the crime for which he was convicted." Doc. No. 1 at 9;"Blood evidence found at the murder scene indicates that Mr. McFarlane is actually innocent." Doc. No. 2, Ex. A at 1-2.)* In fact, the test simply confirmed the testimony McFarlane himself offered before trial and Sparango offered at trial: that the blood police recovered from 1815 Lippincott had nothing to do with the Halterman murder. *(Suppression Hr'g April 20, 1994 at 37-38; Trial Tr. June 10, 1994 at 69-70, 81-83.)* That the documents filed on Petitioner's behalf were replete with other, less significant errors, also suggests that they were not the product of inordinate effort. For instance, in her § 2254 Memorandum, Ms. Rainville asserted that "fingerprints found at the crime scene do not belong to Mr. McFarlane." *(Doc. No. 2 at 4.)* A fingerprint expert had testified at trial, however, that the fingerprints were "not identifiable." *(Trial Tr. June 7, 1994 at 79.)* Similarly, Ms. Rainville stated that "type B blood was found on a pillow case in the bedroom where, according to the prosecution, Ms. Halterman was killed." *(Doc. No. 2 at 3.)* The prosecution's witness had actually testified that the pillowcase was found in the front bedroom, not in the middle bedroom where Ms. Halterman was murdered. *(Trial Tr. June 7, 1994 at 110; Trial Tr. June 10, 1994, 53-56.)* Ms. Rainville described Mr. Myers as a "public defender," when he was actually a court-appointed private attorney. *(Doc. No. 2, Ex. A at 2; Evidentiary Hr'g June 28, 1995 at 3.)* Ms. Rainville repeatedly stated that "[t]he only evidence at trial linking Mr. McFarlane to the [Halterman murder] was the testimony of Mr. Sparango." *(Doc. No. 2, Ex. A at 11.)* As I have described, this is simply incorrect.

At my insistence, Petitioner produced August 2000 through April 2001 time records from Ms. Rainville's firm. *(Oct. 29, 2010 Hr'g Tr. at 106:24-107:21, 111:20-23; Doc. No. 82, Ex. G.)* They show that during this period, Ms. Rainville spent only 9.9 hours on Petitioner's matter. I find incredible Ms. Rainville's testimony that she actually spent considerably more time on this matter—some 100 to 150 hours. She was assisted by two associates who together recorded a total of 94.7 hours. *(Doc. No. 88 at 9.)* According to the time records, no witnesses were interviewed. The associates spent a modest amount of time on factual and legal research; Ms. Rainville spent none.

In sum, the documents Ms. Rainville filed on Petitioner's behalf could have been prepared and filed promptly after she decided in August 2000 to pursue § 2254 relief. Ms. Rainville filed them in April 2001 not because she needed some eight months to prepare them, but because Ms. Rainville mistakenly believed she had a year from August 2000 to seek § 2254 relief.

III.    <u>CONCLUSIONS OF LAW</u>

Robert McFarlane's Habeas Petition—filed almost three years after his murder conviction became final—is time-barred. He has offered no good reason, equitable or otherwise, to toll the running of the one-year limitation period. No "extraordinary circumstance" precluded Petitioner from acting promptly. Rather, the late filing was the result of: 1) Petitioner's failure to monitor his own case once he sought *allocatur*; and 2) Ms. Rainville's mistaken view of the record and the law. Petitioner has presented no "after-discovered evidence" to toll or restart the limitation clock. Moreover, assuming the discovery of evidence of "actual innocence" tolls the clock, Petitioner has produced no such evidence. Indeed, he has done rather the opposite. His August 2000 blood test simply confirmed the Commonwealth's trial evidence that the crime scene blood was Sparango's.

Assuming that Sparango's statement to Ms. Nicolardi relates to the Halterman murder, that statement is not materially different from what Sparango said upon his arrest, at his guilty plea, and at trial.

A.  The Limitation Period

The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year limitation period on those seeking § 2254 habeas relief.   AEDPA provides in pertinent part as follows:

> The limitation period shall run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> > *****
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

McFarlane's judgment of sentence became final on June 2, 1998, 90 days after the Pennsylvania Supreme Court denied *allocatur* on March 4 , 1998.   See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000) (judgment becomes final at the conclusion of direct review or the expiration of time for seeking such review, including the 90-day limit for seeking *certiorari*). McFarlane thus had one year plus 90 days from March 4, 1998—until June 2, 1999—to seek habeas relief.   See id.   McFarlane did not actually file his Petition until almost two years later, on April 4, 2001.   Accordingly, that Petition is time-barred unless McFarlane presents a reason to toll the running of the limitation clock, or establishes some other exception.   28 U.S.C. § 2244(d).

B.  Discussion

McFarlane argues primarily that Mr. McMonagle's purported error equitably tolled the

limitation clock with respect to the issues in his original § 2254 Petition—including Mr. Myers's failure to obtain evidence of Petitioner's innocence by testing the crime scene blood.   Petitioner also contends (apparently in the alternative) that new evidence—Ms. Nicolardi's 2003 affidavit—triggers the statutory exception for after-discovered evidence and demonstrates his actual innocence.   28 U.S.C. § 2244(d)(1)(D).   Although courts deciding § 2254 claims customarily address statutory exceptions first, I will address Petitioner's contentions in the order he presents them.   See, e.g., McAleese v. Brennan, 483 F.3d 206, 212-219 (3d Cir. 2007); Schlueter v. Varner, 384 F.3d 69, 73-79 (3d Cir. 2004).

    1)  Equitable Tolling

The Third Circuit will apply equitable tolling to the running of AEPDA's habeas clock if the petitioner can establish "extraordinary circumstances that prevent him from filing a timely habeas petition *and* the prisoner has exercised reasonable diligence in attempting to investigate and bring his claims." LaCava v. Kyler, 398 F.3d 271, 275-76 (3d Cir. 2005) (citing Fahy v. Horn, 240 F.3d 239, 244-45 (3d Cir. 2001)).   Nevertheless, "courts should be sparing in their use of this doctrine," id., "applying equitable tolling 'only in the rare situation where [it] is demanded by sound legal principles as well as the interests of justice,'" id. at 275 (quoting United States v. Midgley, 142 F.3d 174, 179 (3d Cir.1998)).

In Seitzinger, the Third Circuit held that an attorney's affirmative misrepresentations to a client—about his own actions on that client's behalf—can constitute an extraordinary circumstance.   Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 238 (3d Cir. 1999).   In LaCava v. Kyler, the Court extended a line of holdings that absent affirmative misrepresentation, an attorney's mere failure to inform a client of an unsuccessful appeal does not qualify as

extraordinary: "In non-capital cases, attorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the 'extraordinary' circumstances required for equitable tolling." 398 F.3d 271, 276 (3d Cir. 2005) (quoting Merritt v. Blaine, 326 F.3d 157, 169 (3d Cir. 2003)).

Petitioner contends that in its recent decision of Holland v. Florida, the Supreme Court eliminated any distinction between extraordinary circumstances in capital and non-capital cases and thus effectively overruled LaCava and Seitzinger.   130 S.Ct. 2549 (2010).   In Holland (a capital case), a habeas petitioner argued that his attorney's misconduct triggered equitable tolling, thus saving his otherwise untimely § 2254 petition.   Although it rejected the standard the lower courts had applied in refusing equitable tolling, the Supreme Court nonetheless reiterated well-established equitable tolling requirements: "'(1) that [the petitioner] has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."   Id. at 2562 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).   The Court confirmed that an attorney's "'garden variety' or 'excusable neglect'" does not constitute an "extraordinary circumstance."   Id. at 2564.

Petitioner contends that Mr. McMonagle's purported error was an "extraordinary circumstance" under Holland.   I do not agree.   Insofar as Holland eliminated the requirement in capital cases that those seeking to establish extraordinary circumstances show attorney misrepresentation, it is not yet clear that Holland overruled the Third Circuit's proof requirements in non-capital cases.   See LaCava, 398 F.3d at 276 (quoting Merritt v. Blaine, 326 F.3d 157, 169 (3d Cir. 2003)).

Assuming, *arguendo*, that the Holland standard applies in non-capital cases, Petitioner has

only shown, at worst, "garden variety" or "excusable neglect" by Mr. McMonagle.   See Souliotes v. Evans, 622 F.3d 1173, 1175 (9th Cir. 2010) (attorney's failure "to note the correct date on which [petitioner's] state court decision became final is not an 'extraordinary circumstance [under Holland],' but rather ordinary negligence"); Griffith v. Rednour, 614 F.3d 328, 331 (7th Cir. 2010) (Holland did not alter the rule that a lawyer's failure to understand the law governing timeliness does not constitute an extraordinary circumstance).   I have discredited Ms. McFarlane, and credited Ms. Rizzo's testimony that she never told Ms. McFarlane of the status of Petitioner's *allocatur* application.   Although I have found that Petitioner and his mother were unaware of the *allocatur* denial, Petitioner has not established that this was the result of Mr. McMonagle's error. Assuming, *arguendo*, however, that Mr. McMonagle's office failed to transmit the denial order to the McFarlanes, this "attorney error" was not an "extraordinary circumstance" warranting equitable tolling as set out in Holland (or LaCava).

McFarlane has also failed to demonstrate that he acted with reasonable diligence either during the period before August of 2000 (when Petitioner learned that *allocatur* had been denied) or the period after.   McFarlane never attempted to contact Mr. McMonagle or the Pennsylvania Supreme Court.   Although McFarlane purportedly frequented the prison law library, he never looked at the Pennsylvania Supreme Court's decisions or sought assistance to help him find a report of his case.   Rather, McFarlane "delegated" all monitoring efforts to his mother, who occasionally spoke with Ms. Rizzo, from whom she learned nothing about the status of Petitioner's appeal.   Accordingly, Petitioner has not shown that he was reasonably diligent from the March 4, 1998 *allocatur* denial through his retention of Ms. Rainville in August 2000.   For this reason as well, he is not entitled to tolling with respect to this period.

McFarlane's equitable tolling contention also fails with respect to August 2000 through April 4, 2001, when Ms. Rainville sought habeas relief.   As I have found, this eight-month delay was the result of Ms. Rainville's mistaken belief that she had a year from the August 2000 blood test to seek § 2254 relief.   Although Ms. Rainville was negligent here, that negligence was not an "extraordinary circumstance" tolling the limitation clock under Holland or LaCava.   See Souliotes v. Evans, 622 F.3d 1173, 1175 (9th Cir. 2010) (attorney's failure "to note the correct date on which [petitioner's] state court decision became final is not an 'extraordinary circumstance [under Holland],' but rather ordinary negligence"); Griffith v. Rednour, 614 F.3d 328, 331 (7th Cir. 2010) (Holland did not alter the rule that a lawyer's failure to understand the law governing timeliness does not constitute an extraordinary circumstance); LaCava, 398 F.3d at 276 (3d Cir. 2005) ("[I]n non-capital cases, attorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the 'extraordinary' circumstances required for equitable tolling." (quoting Merritt v. Blaine, 326 F.3d 157, 169 (3d Cir.2003))); Johnson v. Hendricks, 314 F.3d 159 (3d Cir. 2002) (attorney's mistake respecting the habeas filing deadline did not constitute an extraordinary circumstance).

Petitioner must also demonstrate that after August 2000, he pursued § 2254 relief with reasonable diligence.   He has not made such a showing.   The documents filed on April 4, 2001 do not reflect considerable effort, and certainly did not require eight months for the three lawyers working on this case to prepare.   Courts commonly impute such attorney inactivity to the habeas petitioner.   See Schlueter, 384 F.3d at 76 ("Generally, in a non-capital case. . . attorney error is not a sufficient basis for equitable tolling of AEDPA's one-year period of limitation."); Johnson, 314 F.3d at 163 (counsel's erroneous advice respecting the filing deadline did not justify equitable

tolling); <u>Souliotes</u>, 622 F.3d at 1175 (counsel's error respecting deadline was not extraordinary); <u>Doe v. Menefee</u>, 391 F.3d 147 (2d Cir. 2004) ("[T]he act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition."); <u>accord</u> <u>Miranda v. Castro</u>, 292 F.3d 1063, 1068 (9th Cir. 2002); <u>Helton v. Sec'y for the Dep't of Corr.</u>, 259 F.3d 1310, 1313 (11th Cir. 2001); <u>Smaldone v. Senkowski</u>, 273 F.3d 133, 138-39 (2d Cir. 2001); <u>Kreutzer v. Bowersox</u>, 231 F.3d 460, 463 (8th Cir. 2000); <u>see also</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991) (petitioner must bear the risk of attorney error resulting in procedural default).

In evaluating shorter delays, courts have found an absence of reasonable diligence.   <u>See</u> <u>Ragan v. Horn</u>, 598 F. Supp. 2d 677, 681 (E.D. Pa. 2009) (102 days unreasonable) (citing <u>Smith v. McGinnis</u>, 208 F.3d 13, 17-18 (2d Cir.2000) (87 days unreasonable); <u>Melancon v. Kaylo</u>, 259 F.3d 401, 408 (5th Cir. 2001) (four months unreasonable); <u>Fisher v. Johnson</u>, 174 F.3d 710, 715-16 (5th Cir.1999) (six months unreasonable)); <u>see also</u> <u>Cristin v. Brennan</u>, 168 F. App'x 508, 511-12 (3d Cir. 2006) (petitioner could have filed within three months); <u>Brown v. Shannon</u>, 322 F.3d 768, 774 (3d Cir. 2003) (the one month remaining of the applicable limitation period provided the petitioner with a sufficient opportunity to file a *pro se* petition).   <u>But see</u> <u>Knight v. Schofield</u>, 292 F.3d 709 (11th Cir. 2002) ("In the context of the AEDPA's statute of limitations, this court has held that a 'reasonable time' is one year.").

In sum, McFarlane has presented no reason to toll the running of the one-year limitation clock with respect to any portion of the period between the June 2, 1998 finalization of his conviction and his April 4, 2001 Habeas Petition.   Accordingly, that § 2254 filing was untimely. The three claims in the original Petition that McFarlane included in his Amended Petition—actual

innocence (based on the August 2000 blood test), Mr. Myers's ineffectiveness, and evidentiary insufficiency—are time-barred.

2) <u>After-Discovered Evidence of Actual Innocence</u>

Although McFarlane focused in his original Habeas Petition largely on his claim of "actual innocence" based on the August 2000 blood test, in his Proposed Findings and Conclusions, he appears (not surprisingly) to have abandoned that claim. Rather, Petitioner now contends that Sparango's statement to Ms. Nicolardi is "after-discovered evidence" of Petitioner's "actual innocence" that frees him from AEDPA's one-year limitation period. *(Doc. No. 88 at 19-21.)* Petitioner here apparently conflates a statutory exception to the limitation period (after-discovered evidence) with the equitable tolling ostensibly triggered by evidence of actual innocence. Construing Petitioner's contentions as liberally as possible, it is plain that the evidence he presents is not "after-discovered" and does not make out his innocence.

<u>Standards – After-Discovered Evidence</u>

Habeas petitioners presenting newly discovered evidence commonly invoke the AEDPA provision that stops the running of the limitation clock until "the date on which the factual predicate of the claim or claims could have been discovered through the exercise of due diligence." 28 U.S.C. § 2254(d)(1)(D); <u>see</u> <u>Wilson v. Beard</u>, 426 F.3d 653, 659-662 (3d Cir. 2005); <u>Schlueter</u>, 384 F.3d at 73-76.

In considering such an after-discovered evidence claim, the federal court is bound by the factual findings of the state courts that considered the claim on the merits. 28 U.S.C. § 2254(d); <u>see</u> <u>Boyd v. Waymart</u>, 579 F.3d 330, 334 (3d Cir. 2009) (en banc). The federal court may reject those findings only if the petitioner demonstrates that they are "unreasonable." 28 U.S.C. §

2254(d).   If the state courts disposed of the claim without addressing the merits, however, their findings bind the federal court unless the petitioner rebuts them.   See Boyd, 579 F.3d at 334; Lambert v. Blackwell, 387 F.3d 210, 234-35 (3d Cir. 2004).

Standards – Evidence of Actual Innocence

There is little authority suggesting that the discovery of evidence of "actual innocence" tolls the limitation clock.   Petitioner relies on Schlup, a pre-AEDPA decision involving a petitioner whose ineffective counsel claim was procedurally defaulted.   Schlup v. Delo, 513 U.S. 298, 307 n.15 (1995).   The Schlup Court held that the rare petitioner who can demonstrate his actual innocence will overcome a procedural default, thus allowing the federal courts to reach the merits of the petitioner's underlying constitutional claim:

> [When a habeas petitioner] presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Id. at 316.   In so holding, the Court emphasized that Schlup had not presented a "freestanding" claim of innocence (i.e. one unaccompanied by a claim of constitutional trial error).   Id.; see Herrera v. Collins, 506 U.S. 390, 404 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent violation occurring in the underlying state criminal proceeding.")   The Court further explained that to establish actual innocence "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327.   Indeed, the Schlup Court cautioned that only "new reliable evidence" can meet that exacting standard:

> To be credible, such a claim [of actual innocence] requires petitioner to support his

allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

Id. at 324.

In a recent decision respecting procedurally defaulted claims, the Third Circuit summarized Schlup's two requirements:

First, a petitioner must present new, reliable evidence that was not presented at trial. Second, a petitioner must show by a preponderance of the evidence, "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."

Houck v. Stickman, 625 F.3d 88, 93 (3d Cir. 2010) (citation omitted) (quoting Schlup, 513 U.S. at 327).

Petitioner urges me to extend Schlup's application beyond procedurally defaulted claims to AEDPA's statute of limitations. Since AEDPA's adoption in 1996, five Circuits have expressly rejected such an extension, holding that Schlup does not apply to AEDPA. The Sixth Circuit alone has recognized an actual innocence exception to AEDPA's limitation period. Lee v. Lampert, 610 F.3d 1125, 1129 (9th Cir. 2010); Escamilla v. Jungwirth, 426 F.3d 868, 871-72 (7th Cir. 2005); David v. Hall, 318 F.3d 343, 347 (1st Cir. 2003); Cousin v. Lensing, 310 F.3d 843, 849 (5th Cir. 2002); Flanders v. Graves, 299 F.3d 974, 976-78 (8th Cir. 2002). But see Souter v. Jones, 395 F.3d 577, 585 (6th Cir. 2005).

In its precedential decisions, the Third Circuit has not yet decided the issue. See Teagle v. DiGuglielmo, 336 F. App'x 209, 212 (3d Cir. 2009); McKeever v. Warden SCI-Graterford, 486 F.3d 81, 84 n.5 (3d Cir. 2007); Hussman v. Vaughn, 67 F. App'x 667 (3d Cir. 2003). But see Black v. Dist. Att'y of Phila. Cty., 246 F. App'x 795, 798 (3d Cir. 2007) (granting relief because "rigid application of the statute would result in upholding a sentence for a crime that in fact was not

a crime" at the time the act was undertaken).   I will nonetheless assume that the Third Circuit will

follow the Sixth Circuit and read into AEDPA an "actual innocence" exception to AEDPA's

limitation period.

In applying the <u>Schlup</u> "actual innocence" exception, however, I remain bound by the

Third Circuit's holdings respecting the kinds of evidence that can make out "actual innocence."

Petitioner characterizes Sparango's statement to Ms. Nicolardi as a "recantation" of Sparango's

trial testimony.   *(Doc. No. 88 at 22.)*   In applying the <u>Schlup</u> "actual innocence" exception to

pre-AEDPA cases, the Third Circuit has held that recantation is the least reliable form of new

evidence, describing it as "suspicious and untrustworthy evidence [that] does not, in the absence of

additional corroborating evidence or circumstances, meet the standard of reliability contemplated

by <u>Schlup</u>."   <u>Teagle v. Digugielmo</u>, 336 F. App'x 209, 213 (3d Cir. 2009) (citing <u>Landano v.

Rafferty</u>, 856 F.2d 569, 572 (3d Cir. 1988) ("Courts have historically viewed recantation

testimony with great suspicion.")).

<u>Sparango's Statement to Ms. Nicolardi – After-Discovered Evidence</u>

In rejecting McFarlane's PRCA appeal, the Superior Court applied criteria quite similar to

those set out in § 2254(d)(1)(D), and concluded that the Sparango statement was not

"after-discovered evidence."   The Court found, *inter alia*, that McFarlane had failed to establish

that 1) the "vague statement" even related to the Halterman murder; and 2) that the statement could

not have been discovered through trial counsel's exercise of due diligence.   I am bound by these

findings, even though the Superior Court did not hold a hearing before making them.   28 U.S.C. §

2254(d); <u>Fahy</u>, 516 F.3d at 182 (§ 2254 "no longer explicitly conditions federal deference to state

court factual findings on whether the state court held a hearing" (quoting <u>Lambert</u>, 387 F.3d at

238)).

McFarlane argues that the findings are not binding because they are "unreasonable" under § 2254(d)(2). That provision is inapplicable, however, because the Superior Court ruled that the PCRA petition was time-barred and so did not reject McFarlane's claims "on the merits." (*"We will not reach the merits of these claims as McFarlane's petition is time-barred." Doc. No. 70 Ex. at 4.*) See Boyd, 579 F.3d at 334 (3d Cir. 2009) (en banc) (citing Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002)). Accordingly, McFarlane must, under § 2254(e), rebut the Superior Court's factual findings. 28 U.S.C. § 2254(e); Fahy, 516 F.3d at 180 (3d Cir. 2008) (conducting § 2254(e) analysis after finding § 2254(d) inapplicable). He has presented no evidence in rebuttal. Rather, he offers only his contention that in preparing for trial, Mr. Myers was not obligated to interview Ms. Nicolardi, any more than he was obligated to interview "every person with whom Sparango ever had a conversation between 1994 and his death." *(Doc. No. 90 at 16.)* This overstatement does not rebut the Superior Court's finding respecting the availability of the Nicolardi evidence, which remains binding on me.

Even if I were not so bound, I would make the same finding based on the evidence before me. Sparango's hospitalization and precarious health were well known to counsel. Two months before trial, as Sparango's health rapidly deteriorated, his physician warned that Sparango might not live long enough to appear at trial. *(Hr'g Tr. April 12, 1994 at 2-3.)* Indeed, the physician—an infectious disease specialist—testified extensively before trial about Sparango's near-continuous treatment at Episcopal Hospital and his prison's infirmary. *(Id. at 7-15.)* As Ms. Rainville testified, Sparango was so ill, he "was allowed to live in a hospital." *(Oct. 29, 2010 Hr'g Tr. at 124:7-8.)* Trial counsel thus knew that hospital staff was constantly treating

33

Sparango. Those staff members—like Ms. Nicolardi—were available to speak with a private investigator or trial counsel himself. Indeed, Ms. Nicolardi testified that she would have told Petitioner's counsel of Sparango's statement had she been asked about it at the time it was made. *(Oct. 29, 2010 Hr'g Tr. at 60:19-23.)* The Nicolardi evidence was thus available to Mr. Myers had he chosen to investigate Sparango's statements to those people with whom he spent his last months. Cf. Schlueter, 384 F.3d at 74 (petitioner who discovered his counsel's conflict of interest a decade after trial could, with due diligence, have discovered the conflict years earlier by interviewing members of the "relatively small legal community"); Banjo v. Ayers, 614 F.3d 964, 967 (9th Cir. 2010) (affirming state court's finding that petitioner's delay in interviewing a witness who lived in the area and was freely available was not duly diligent); Wood v. Spencer, 487 F.3d 1, 5 (1st Cir. 2007) (due diligence required petitioner who had "reason to believe" that a conversation "might have occurred" to investigate); Daniels v. Uchtman, 421 F.3d 490, 492 (7th Cir. 2005) (when statement could have been taken earlier but was not, petitioner failed to demonstrate due diligence).

In these circumstances, the Nicolardi evidence is not after-discovered within the meaning of § 2254(d)(1)(D) because it could have been discovered before trial.

Finally, even if, as Petitioner suggests, Sparango first spoke to Ms. Nicolardi after trial (and before Sparango's December 1994 death), her statement still could have been discovered and presented to the state court through the exercise of due diligence. Petitioner's failure to find and present this evidence within one year of the time it thus became available renders this "after-discovered evidence" claim time-barred. See Schlueter, 384 F.3d at 79.

<u>Sparango's Statement to Ms. Nicolardi – Evidence of "Actual Innocence"</u>

Petitioner seeks to present through the Nicolardi evidence a "freestanding" claim of actual innocence that would fall outside the scope of <u>Schlup</u>. I have already considered and rejected the sole argument—equitable tolling—Petitioner advances to defend the timeliness of his ineffective counsel and insufficient evidence claims. As a result, Petitioner presents no timely claims of constitutional error to be reached by means of his gateway "innocence" claim. Third Circuit authority suggests that I may not consider such a claim. <u>See</u> <u>Fielder v. Varner</u>, 379 F.3d 113, 122 (3d Cir. 2004) ("It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" (quoting <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993))). Assuming, *arguendo*, that I may consider this "freestanding" innocence claim, it would nonetheless fail.

Petitioner characterizes Sparango's statement to Ms. Nicolardi as a "recantation" of his trial testimony and a "confession" that he alone killed Ms. Halterman. *(Doc. No. 88 at 22, 19.)* This confounds the record, the law, and the statement itself.

First, I remain bound by the Superior Court's unrebutted finding that the "vague" Sparango statement does not necessarily even relate to the Halterman murder. *(Doc. No. 70, Ex. at 8.)* Assuming *arguendo* that it does, it is of a piece with Sparango's testimony and other evidence the Commonwealth presented at trial.

As I have already described, the Commonwealth showed that McFarlane ensured Sparango's subservience through continued and violent abuse. Sparango thus described how, in carrying out his conspiracy with McFarlane to murder Ms. Halterman, he repeatedly followed McFarlane's orders. At McFarlane's command, Sparango tried to lure Ms. Parris to 1815

Lippincott, used phony vials of crack cocaine to lure Ms. Halterman to the house, dressed Ms. Halterman's corpse, and helped McFarlane cram her body into a crawlspace. *(Trial Tr. June 10, 1994 at 42-47, 50-53, 56-57, 72-75 .)* In his statements to police, during his guilty plea colloquy, and at trial, Sparango acknowledged that he took these actions—which made him liable for Ms. Halterman's murder—because he "was scared that if I didn't [McFarlane] was going to kill me." *(Statement March 28, 1993; Guilty Plea Colloquy April 23, 1993 at 46:9-10; Trial Tr. June 10, 1994 at 56.)* Indeed, at Petitioner's preliminary hearing, when the prosecutor asked Sparango why he thought McFarlane would kill him, Sparango answered as follows:

> [SPARANGO]: Because he told me if I didn't help him [kill Ms. Halterman], he was going to kill me or hurt me like in the past anyway.

*(Preliminary Hr'g July 1, 1993 at 37.)*

Read in this context, Sparango's statement to Ms. Nicolardi that he killed a woman because he feared that, if he did not, his "buddy" would kill him is neither a "recantation" of his trial testimony, nor a "confession" that Sparango alone committed the murder. On the contrary, it is consistent with Sparango's unchanging version of the crime. It is also a reiteration of the complicity he acknowledged when he pled guilty to the Halterman murder. *("You realize that you are just as criminally responsible for the homicide as if you had perpetuated it with your own hands." Guilty Plea Colloquy April 23, 1993 at 49:23-50:2.)*

In these circumstances, it is by no means clear that Mr. Myers would have even used Sparango's prior consistent statement at trial had it been available. Had he used it, the statement certainly would not have made it "more likely than not that no reasonable juror would have found [McFarlane] guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327. This is especially true given the considerable evidence the Commonwealth presented over the course of the two-week

trial to corroborate Sparango's testimony: Ms. Parris refuted Petitioner's testimony that he and Sparango had parted company after leaving the bar on February 16, 1993. Rather, she testified that both men tried to convince her to go to 1815 Lippincott, but that she refused because Petitioner "scared" her. Mr. Lewis testified that contrary to McFarlane's trial testimony, Lewis had heard McFarlane boast of his torture of Sparango. On the day of the Halterman murder, police recovered from Petitioner's bedroom (where the murder occurred) Petitioner's wallet, the murder "weapon," vials of talcum powder made to look like crack cocaine, and McFarlane's disability application—dated the day of the murder—in Petitioner's hand, describing his "violent outbursts," and his desire to "hurt or kill" anyone McFarlane believed was "against" him. *(Trial Tr. June 14, 1994 at 80.)* When Petitioner heard police arriving at 1815 Lippincott on February 17, 1993, he immediately fled wearing only shorts and socks.

Finally, even if I construe Sparango's statement as Petitioner does—in isolation from the entire record—I agree with the Superior Court's conclusion that McFarlane would remain liable for the Halterman murder. See Commonwealth v. Cox, 686 A.2d 1279, 1286 (Pa. 1996) (accomplice remains guilty of first degree murder whether he or his co-conspirator performed the actual killing); Lambert v. Blackwell, 2003 WL 1718511 at 56 (E.D. Pa. 2003) ("Lambert was at least guilty of first degree murder on an accomplice basis."), aff'd, 387 F.3d 210 (3d Cir. 2004); see also House v. Bell, 547 U.S. 518, 539-40 (2006) ("[T]he Schlup inquiry. . . requires a holistic judgment about 'all the evidence' [and] does not turn on discrete findings regarding disputed points of fact.").

In sum, Sparango's statement to Ms. Nicolardi is not evidence of Petitioner's actual innocence and so does not equitably toll the running of AEDPA's one-year limitation clock.

IV.    <u>CONCLUSION</u>

The Third Circuit has ordered a prompt determination of the timeliness of Robert McFarlane's Habeas Petition.    Accordingly, I have limited my analysis to timeliness and have not considered the Petition's merits or other issues, such as procedural default.    I conclude that McFarlane's Petition is time-barred because it was filed almost two years after AEDPA's limitation period expired.    Petitioner has offered no new evidence or other basis to toll or restart that limitation period.    Indeed, he has presented nothing that impugns the jury's verdict.

An appropriate Order follows.

**IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

_____

**Paul S. Diamond, Judge**